[Sac. No. 7907. In Bank. Dec. 6, 1971.]

VIRGINIA VILLA et al., Petitioners, v.
JAMES M. HALL, as Secretary, etc., et al., Respondents.

**COUNSEL**

Ralph Santiago Abrascal, Valerie Vanaman, Daniel S. Brunner and Steven J. Cole for Petitioners.

Karlton & Blease and Coleman A. Blease as Amici Curiae on behalf of Petitioners.

Evelle J. Younger, Attorney General, and Jerold A. Prod, Deputy Attorney General, for Respondents.

## OPINION

**MOSK,** Petitioners in this class action seek to invalidate a portion of section 28 of the California Welfare Reform Act of 1971 (Stats. 1971, ch. 578) on the ground it is incompatible with the federal Social Security Act. Because the unimpaired operation of the welfare program is of utmost significance to all the people of this state (see Welf. & Inst. Code, § 10000)[1] and because these petitioners would be affected drastically by the delays of protracted litigation, the matter is appropriate for the exercise of our original jurisdiction. (*Mooney* v. *Pickett* (1971) 4 Cal.3d 669, 675 [94 Cal.Rptr. 279, 483 P.2d 1231], and cases cited.)

Petitioners represent a class of individuals receiving aid under the state's Aid to Families with Dependent Children (AFDC) program. (Welf. & Inst. Code, §§ 11200-11489.) AFDC is one of four major categorical assistance programs established by the Social Security Act of 1935.[2] The program is based on the concept of "co-operative federalism," in that it is financed largely by the federal government on a matching-funds basis but is administered by the individual states. States are not required to participate in the program, but those which desire to take advantage of the substantial federal resources available must submit an AFDC plan for approval by the Secretary of the Department of Health, Education and Welfare (HEW) (42 U.S.C. §§ 601-604), and the state plan must conform with the requirements of the Social Security Act and applicable HEW regulations. (*King* v. *Smith* (1968) 392 U.S. 309, 316-317 [20 L.Ed.2d 1118, 1125-1126, 88 S.Ct. 2128].)

While the states are accorded significant discretion as to the details of their individual programs, there are two factors which under federal law must enter into the determination of benefits to be paid. First, standards of need must be established, i.e., a yardstick for ascertaining who is eligible for public assistance. Second, states must then decide how much assistance

---

[1]Welfare and Institutions Code section 10000 provides that the statutory purpose is to "provide for protection, care, and assistance to the people of the state in need thereof, and to promote the welfare and happiness of all of the people of the state by providing appropriate aid and services to all of its needy and distressed. It is the legislative intent that aid shall be administered and services provided promptly and humanely, with due regard for the preservation of family life, and without discrimination on account of race, national origin or ancestry, religion, or political affiliation; and that aid shall be so administered and services so provided as to encourage self-respect, self-reliance, and the desire to be a good citizen, useful to society."

[2]The four major programs are Old Age Assistance (42 U.S.C. § 301 et seq.); Aid to Families with Dependent Children (42 U.S.C. § 601 et seq.); Aid to the Blind (42 U.S.C. § 1201 et seq.); and Aid for the Permanently and Totally Disabled (42 U.S.C. § 1351 et seq.).

will in fact be given. (*Rosado* v. *Wyman* (1970) 397 U.S. 397, 408 [25 L.Ed.2d 442, 453, 90 S.Ct. 1207]; *King* v. *Smith, supra,* at pp. 318-319 [20 L.Ed.2d at pp. 1126-1127].)

The provisions of California's AFDC program corresponding to the two factors identified in *Rosado* and *King* are found in sections 11450 and 11452 of the Welfare and Institutions Code. Section 11452 establishes "minimum basic standards of adequate care," i.e., standards of need. Such standards are designed to insure safe and healthful housing; minimum clothing for health and decency; adequate food; utilities, certain household, personal, and miscellaneous needs; and essential medical and dental care not otherwise provided by the public. A monetary schedule for these standards of need was, until the Welfare Reform Act of 1971, contained in regulations promulgated by the State Department of Social Welfare. (State Department of Social Welfare, Manual of Policies and Procedures: Eligibility and Assistance Standards, § 44-212.) Under the new act, the amounts are set forth in the Welfare and Institutions Code (Welf. & Inst. Code, § 11452, as amended by Stats. 1971, ch. 578, § 28.5.)

It is well settled, however, that the states are not required to pay full needs: individual needs may be made subject to the statewide application of either a percentage figure (i.e., a "ratable reduction") or a flat statutory maximum. California has chosen the latter method and has established such maximums in section 11450 of the code. Thus under section 11452 as amended a family of two needs $210 a month to secure adequate care, but the amount of aid that will actually be paid is limited to $190 by the statutory maximum provided in section 11450; corresponding figures for a family of three are $255 and $235; of four, $314 and $280; of five, $362 and $320; et cetera.

Prior to the enactment of the Welfare Reform Act, any outside income earned by the recipient and not exempted[3] was deducted from the standard of need to determine the actual requirements of the individual recipient.[4] The new law, however, provides that income be subtracted not from

---

[3]See Social Security Act, sections 402, subdivision (a)(7), 402, subdivision (a)(8) (42 U.S.C. §§ 602, subd. (a)(7), 602, subd. (a)(8)); *County of Alameda* v. *Carleson* (1971) 5 Cal.3d 730 [97 Cal.Rptr. 385, 488 P.2d 953].

[4]Prior to the new law, section 11450, subdivision (a), read in part: "For each needy family which includes one or more needy children qualified for aid . . ., there shall be paid the sums specified in the following table, or so much thereof as is necessary for the adequate care of the needy family. . . ."

Pursuant to that statute the Department of Social Welfare issued Eligibility and Assistance Standard section 44-315.51, which provides in part: "[T]he budget deficit is determined by . . . [s]ubtracting the rounded current income from the rounded total need. The amount of the AFDC monthly payment is the budget deficit, or the [statutory maximum], whichever is less."

the standard of need but from the lower statutory maximum.[5] Petitioners contend that the Social Security Act compels income to be deducted from the standard of need and not from the statutory maximum, and hence the new California statute is to that extent incompatible with federal law.

Any analysis of federal law requirements necessarily must begin with the Social Security Act itself. In section 402, subdivision (a)(7), Congress has specifically recognized that the income of a recipient relates to his or her need. "[T]he State agency shall, *in determining need,* take into consideration any other income and resources of any child or relative claiming aid to families with dependent children . . . ." (Italics added; 42 U.S.C. § 602, subd. (a)(7).)

The rationale of this statutory provision appears eminently sound. The first stage in the two-step process identified by the Supreme Court in *Rosado* v. *Wyman, supra,* is to ascertain the general minimum needs of the community. Naturally, those in otherwise equivalent categories will require greater or lesser aid depending on the amount of income, if any, which they earn. If state budgets were designed so that 100 percent of need were paid to those on the AFDC program, there would be no dispute before us: clearly income would be substracted from the statewide standard in order to ascertain an individual's actual need, and that amount would be paid.[6] However, Congress chose not to rigidly require the states to pay full need, and the Social Security Act specifically recognizes the validity of statutory maximums. (See 42 U.S.C. § 602, subd. (a)(23).) Nevertheless, this recognition does not alter the fundamental concept, as exemplified by section 402, subdivision (a)(7), that income of a recipient relates to his or her *need,*[7] not to a designed *statutory maximum* the only support for which is found in budgetary limitations.[8]

---

[5]"[T]here shall be paid, notwithstanding minimum basic standards of adequate care established by the department under Section 11452, an amount of aid each month which when added to his income . . . is equal to the sums specified in the [statutory maximum] table. . . ." (Welf. & Inst. Code, § 11450, as amended by Stats. 1971, ch. 578, § 28.)

[6]As of July 1971, HEW figures indicate that 14 states were paying 100 percent of the standard of need to those without income or 100 percent of the deficit (standard of need less income) to those with income. (See "Summary of Payment Methods," July 1971, attachment to amicus curiae brief of HEW, *Whitfield* v. *King* (M.D. Ala.) Civ. No. 3330-N.)

[7]HEW regulations stress that it is income or resources *actually* available to the recipient that is determinative. (45 C.F.R. § 233.20, subd. (a)(3)(ii)(c).) The emphasis appears to require the state to ascertain the amount of aid the recipient in fact needs for adequate care by subtracting income and/or resources actually, not supposedly, received, from the standard of need. Thus child support due, but not actually received, is not considered income for this purpose.

[8]Another provision of the federal act (42 U.S.C. § 602, subd. (a)(8)) compels

Published HEW interpretations of section 402, subdivision (a)(7), moreover, bolster the conclusion that income is to be related to need: "Provision must be made that in arriving at the amount of assistance needed, the State will compare all income and resources found to be available to the individual for his use in meeting his current needs with the amount arrived at through the application of the State-wide standard." (Fed. Handbook of Pub. Asst., pt. IV, § 3120.)

Respondents contend that the current HEW attitude on the role of outside income in the computation of AFDC payments is indicated in the amicus brief the agency submitted to the United States Supreme Court in *Jefferson* v. *Hackney,* No. 6553, Oct. Term 1970.[9] There HEW takes the position that a Texas plan which subtracts income from a ratably reduced standard (not a statutory maximum) rather than from the full standard of need does not conflict with federal requirements. HEW's position in *Jefferson* is not controlling here for two reasons, in addition to the prevailing rule of administrative law that the ultimate authority of statutory interpretation rests in the judiciary. (*Volkswagenwerk* v. *FMC.* (1968) 390 U.S. 261, 272 [19 L.Ed.2d 1090, 1097, 88 S.Ct. 929]; 1 Davis, Administrative Law (1958) § 506, pp. 326-327.)

First, the complaint in *Jefferson* was based on section 402, subdivision (a)(23), of the act, whereas the current challenge is founded in part on section 402, subdivision (a)(7). The former provision requires states to increase their standards of need and any statutory maximums to reflect cost of living rises; it makes no reference to the use of income in the determination of payments. Because the court in *Rosado* v. *Wyman, supra,* narrowly viewed the Social Security Amendments of 1967, adding section 402, subdivision (a)(23), as not requiring an overall increase in benefit levels, HEW might reasonably conclude that section *alone* does not prohibit any decreases in aid occasioned by subtracting income from a ratable reduction rather than the standard of need.[10]

---

the conclusion that income is to be subtracted from need rather than from the statutory maximum. The provision allows a recipient to disregard a certain portion of his or her income in determining actual need. However, this "disregard" provision is generally not available to those persons whose total income exceeds their *need,* not merely the statutory maximum. (See *County of Alameda* v. *Carleson* (1971) 5 Cal.3d 730, 739 [97 Cal.Rptr. 385, 488 P.2d 953].)

[9] As of this writing, the case has not been decided by the Supreme Court. However, the point made by respondents is not the ultimate result but the HEW position.

[10] The New York statute under scrutiny in *Rosado* replaced an individualized computation of a recipient's standard of need with a scheme based, in part, on a flat allowance for certain needs according to average age. The high court held the new law inconsistent with section 402, subdivision (a)(23), which, it said, "invalidates any state program that substantially alters the content of the standard of need

Second, *Jefferson* involves ratable reductions rather than statutory maximums. Both the Social Security Act (see 42 U.S.C. § 602, subd. (a) (23)) and the United States Supreme Court in *Rosado* make crucial distinctions between maximums and ratable reductions. The former is disfavored; the latter preferred. After *Rosado,* states could effectuate downward adjustments in welfare payments only by means of ratable reductions; they could not achieve the same result by decreasing applicable statutory maximums. (397 U.S. at pp. 413-414 [25 L.Ed.2d at pp. 456-457].) *Rosado* emphasized that one of the aims of the 1967 amendment was to encourage the states to adopt ratable reduction plans. (*Id.*)[11] Thus, in light of the different treatment afforded statutory maximums and ratable reductions, it does not necessarily follow from HEW's position in *Jefferson* (i.e., to allow income to be subtracted from ratable reductions) that income may also be deducted from statutory maximums.[12]

More significantly, language in *Rosado* directly conflicts with the HEW position in *Jefferson* and thus creates considerable doubt as to the tenability of respondents' reliance on that HEW position. In defining ratable reduction the court in *Rosado* said: "A 'ratable reduction' represents a fixed percentage of the standard of need that will be paid to all recipients. In the event that there is some income which is *first deducted,* the ratable

---

in such a way that it is less than it was prior to the enactment of § 402(a)(23), unless a state can demonstrate that the items formerly included no longer constituted part of the reality of existence for the majority of welfare recipients." (397 U.S. at p. 419 [25 L.Ed.2d at p. 459].) The vice of the new statute was not necessarily that it provided for the averaging of certain needs but that "special grants" were eliminated from the computation of the need standard without a showing that such grants no longer represented a part of "the reality of existence" for the recipients. (*Id.*)

[11]The advantage of a single ratable reduction which applies to all welfare recipients regardless of their specific needs, is that all recipients receive the same percentage of their need. Comparing the standard of need table in the Welfare Reform Act with the act's statutory maximum table shows that, before income is subtracted, a family of three needy persons will receive 92.2 percent of the minimum required for its care while a family with 10 or more will receive only 84.7 percent. (Welf. & Inst. Code, § § 11450, 11452, as amended.)

[12]Of equal significance is the fact that subtracting income from ratable reductions does not violate another principle of *Rosado,* namely, that the states may not obscure the standard of need. (397 U.S. at p. 413 [25 L.Ed.2d at p. 456].) Under the Texas plan challenged in *Jefferson,* the standard of need remains crucial because it is to that figure which the percentage is applied. Increasing the standard of need increases the amount of aid received, assuming the ratable reduction percentage is not lowered. Even though income is subtracted from the reduced figure, *the standard of need* continues to be relevant. Subtracting income from the statutory maximum relegates the standard of need to a virtually irrelevant position: it does not serve as the basis for determining *actual* need of a recipient, or any other meaningful purpose. As long as the maximum remains constant, increases in the standard of need would not affect *the amount of benefits paid.*

reduction is applied to the amount by which the individual or family falls short of need." (Italics added; 397 U.S. at p. 409, fn. 13 [25 L.Ed.2d at p. 454].)

Both HEW in *Jefferson* and respondents here characterize the quoted statement of the Supreme Court as dictum. Closer analysis, however, reveals that this description of the mechanics of the ratable reduction procedure was necessary to the court's interpretation of the 1967 amendment which requires standards of need and statutory maximums to be increased to reflect cost of living rises. The petitioner in *Rosado* argued that the amendment compels an increase in the level of benefits actually paid. The court rejected that contention, and said that subsequent to the amendment the states could nevertheless reduce the amount of aid by lowering the ratable reduction percentage or by changing from a statutory maximum to a relatively low ratable reduction; only maximums could not be lowered. The court stated, however, that its conclusion did not render the amendment "a meaningless exercise in 'bookkeeping.'" (397 U.S. at p. 413 [25 L.Ed.2d at p. 456].) Instead, it discerned two congressional purposes from the new provision, one of which was: "It has the effect of requiring the States to recognize and accept responsibility for those additional individuals whose income falls short of the standard of need as computed in light of economic realities and to place them among those eligible for the care and training provisions." (*Id.*)

Thus, as long as the standards of need were increased, additional individuals would be included in the program, notwithstanding the fact that payments might be reduced pursuant to lower ratable reduction percentages. However, the court also recognized in its footnote 13 that an increase in the number of recipients could be assured *only* if income was to be subtracted from the standard of need before the ratable reduction was applied. At least according to the interpretation in *Rosado,* the 1967 amendment was not concerned with the level of benefits paid to the truly destitute, those without outside resources. The court therefore refused to require an increase in benefits; instead, it concluded that the intent of the amendment was to reach an additional group of recipients, all of whom had outside income or resources.

The following hypothetical example demonstrates that by subtracting income from a ratably reduced figure or from a statutory maximum, a state could successfully avoid the court's interpretation that the amendment was designed to increase the number of people eligible for aid: Assume that prior to the 1967 amendment the standard of need for a family of two was $200 and the statutory maximum was $170 (or the ratable

reduction for all need levels was 85 percent). The amendment mandated the states to increase both the standard of need and the statutory maximum. Thus, at the very least, families of two with outside income of $201 per month would accordingly become eligible for aid. Assume, pursuant to the amendment, that the standard of need was increased to $250 and the statutory maximum to $200 (or that the state changed its ratable reduction to 80 percent). Under California practice prior to the Welfare Reform Act an individual with outside income of $201 would have an actual need of $49 ($250 less $201) which would be paid in full because it was less than the applicable maximum ($200). Under the procedure adopted by the Welfare Reform Act, however, an individual earning $201 would still be ineligible because when the outside income ($201) is subtracted from the statutory maximum ($200) no "actual need" remains.

Thus, a state could completely avoid the *Rosado* interpretation of section 402, subdivision (a)(23), by raising its post-amendment maximum only to the level of its pre-amendment standard of need or by decreasing its ratable reduction accordingly, and then subtracting income from the lower figure. Such a scheme is inconsistent with the result the *Rosado* court said Congress sought to achieve and would indeed render the amendment a "meaningless exercise in bookkeeping." In order to insure the effectuation of the end desired by Congress, the court concluded in its footnote 13 that income must be deducted from the standard of need and not from the ratably reduced figure (or likewise a statutory maximum).[13]

The conclusion that the Social Security Act requires outside income to be subtracted from standards of need rather than from statutory maximums or ratable reductions is also founded on a strong public policy of encouraging welfare recipients to become constantly more self-supporting. Yet deducting income from statutory maximums makes gainful employment significantly less attractive to the recipient. This follows because all nonexempt income will be offset directly against the amount of the grant and not against the standard of need to determine actual need; for every nonexempt dollar earned, the amount of aid will therefore be decreased one dollar. Since the grant is always less than the standard of need, in many instances the system adopted by the Welfare Reform Act will result in an

[13]The court's conclusion in *Rosado* was founded on section 402, subdivision (a)(23), of the act. Much of the discussion by petitioners and respondents here has focused on section 402, subdivision (a)(7). Our decision, however, is based on both sections, on the holding in *Rosado* v. *Wyman, supra,* on section 402, subdivision (a)(8), and on considerations of employment incentive. Thus we disagree with the position of HEW, expressed in its amicus brief filed in *Whitfield* v. *King* (M.D. Ala.) *supra,* Civ. No. 3330-N, that section 402, subdivision (a)(7), does not, at least in part, compel the result we reach today.

individual's need not being met even after adding both exempt and non-exempt income to the AFDC payment. Such recipients will be forced to exist below the bare minimum necessary for adequate care, even though they have commenced, by obtaining employment, to break free from the debilitating "welfare syndrome." The practice thus conflicts with the stated federal policy to provide incentives to obtain and maintain an employment status. (See 1967 U.S. Code Cong. & Admin. News, pp. 2994-2995; *County of Alameda* v. *Carleson* (1971) *supra,* 5 Cal.3d 730, 741-742.)

■ We conclude that section 11450, as amended by section 28 of the Welfare Reform Act, is inconsistent with the Social Security Act insofar as it requires income to be deducted from statutory maximums and not from standards of need.[14] ■ While manifestly the states are not required to participate in the federal AFDC program, as long as they accept federal funds for this purpose they must comply with federal law in the administration of their programs. (*King* v. *Smith, supra; Rosado* v. *Wyman, supra; County of Alameda* v. *Carleson* (1971) *supra,* 5 Cal.3d at p. 739.) ■ The acceptance of federal funds pursuant to a state program not in compliance with the Social Security Act and the regulations promulgated thereunder would violate federal law in an area in which it is supreme. (U.S. Const., art. VI, § 2; see *Rosado* v. *Wyman* (1970) *supra,* 397 U.S. 397, 428 [25 L.Ed.2d 442, 464] (Douglas, J., concurring) ["The wrong alleged is the State's failure to comply with federal requirements in its use of federal funds, not HEW's failure to withhold funds from the state."].)

We thus turn to the remedy to be afforded petitioners. *In re Bell* (1942) 19 Cal.2d 488, 498 [122 P.2d 22], declared that California law requires an unconstitutional portion of a statute be severed and "the remainder [to] stand if it is complete in itself and would have been adopted by the legislative body had the latter foreseen the partial invalidation of the statute." (Cf. *In re Blaney* (1947) 30 Cal.2d 643, 655 [184 P.2d 892].) We need not speculate as to what action the Legislature might have taken had it foreseen the decision which we reach today. In section 41 of the new law the Legislature has expressly provided for severance "if any provision of this act . . . is held invalid." (Stats. 1971, ch. 578, § 41.)

In *Bell* we undertook to sever one section of a county anti-picketing ordinance and several words from another section. (19 Cal.2d at p. 497-498.) Section 11450 of the Welfare and Institutions Code is likewise "mechani-

---

[14]We do not reach petitioners' contention that section 11450 as amended denies aid to a number of eligible recipients whereas federal law requires some amount of aid to *all* those eligible. (But see *Dandridge* v. *Williams* (1970) 397 U.S. 471, 481 [25 L.Ed.2d 491, 499, 90 S.Ct. 1153].)

cally severable" within the meaning of *Bell* so that it conforms to federal law. This can be accomplished as an administrative matter without affecting the other policy determinations made by the Legislature in its amendments to section 11450 by deleting the following provision from subdivision (a) of that section: "when added to his income, exclusive of any amounts considered exempt as income or paid pursuant to subdivision (d) of this section or Section 11453.1, . . ."

In view of our interpretation of the mandate of federal law, section 11450, subdivision (a), with the foregoing deletion, can readily be interpreted as requiring income to be subtracted from an individual's standard of need; the statutory maximum becomes relevant only after that mathematical process is completed. If, however, the exact formula for determining aid to those with outside income needs clarification in addition to that contained in section 11450 as interpreted herein, respondent Carleson is directed to issue regulations pursuant to his statutory authority under Welfare and Institutions Code section 10600 in order to secure full compliance with federal law.[15]

Our order of September 30, 1971, stayed the operation of section 28 of the Welfare Reform Act insofar as it amended section 11450, subdivision (a). Prior to that order section 28 was to become operative on October 1, 1971, the date on which the remainder of the act went into effect. By invalidating only a portion of section 28, we gave deference to the legislative determination, evidenced by section 41 of the act, that valid provisions of the act should be unaffected by any invalid provisions.

With this legislative mandate in mind, we accordingly hold that the adjusted payments to be made pursuant to section 28, as interpreted herein, shall be retroactive to October 1, 1971. This conclusion fully effectuates the severance policy embodied in section 41, since the entire act will then be operative from October 1 with the exception of the provision which we have severed here. Respondent Carleson should therefore adopt a plan pursuant to which those who received improper payments on and after October 1 will be paid the adjusted amount to which we now hold they are entitled. (Cf. Welf. & Inst. Code, § 11004, subd. (g), as amended by Stats. 1971, ch. 578, § 20.3.)

---

[15]Section 10600 provides: "It is hereby declared that provision for public social services in this code is a matter of statewide concern. The department is hereby designated as the single state agency with full power to supervise every phase of the administration of the public social services for which grants-in-aid are received from the United States government or made by the state in order to secure full compliance with the applicable provisions of state and federal laws." (See also § § 10604, 10606.)

Our order staying operation of section 28 is vacated. Let a peremptory writ of mandate issue as prayed.

Wright, C. J., McComb, J., Peters, J., Tobriner, J., Burke, J., and Sullivan, J., concurred.

Respondents' petition for a rehearing was denied January 5, 1972.

On June 7, 1972 the United States Supreme Court granted a petition for a writ of certiorari and filed an order vacating the judgment and remanding the cause to the Supreme Court of California for further consideration in light of *Jefferson* v. *Hackney,* 406 U.S. 535 [32 L.Ed.2d 285, 92 S.Ct. 1724].