[Civ. No. 14407. Fourth Dist., Div. One. Apr. 23, 1976.]

GARY C. ADEN et al., Petitioners, v.
EVELLE J. YOUNGER, as Attorney General, etc., et al., Respondents.

**COUNSEL**

Kaminar, Sorbo, Andreen & Thorn, Robert Thorn and L. William McGrath, Jr., for Petitioners.

Wainer & Stone, Arnold J. Stone, Ball, Hunt, Hart, Brown & Baerwitz, Robert E. Aitken and Gary D. Vestermark as Amici Curiae on behalf of Petitioners.

Evelle J. Younger, Attorney General, Elizabeth Palmer, Assistant Attorney General, and Edward M. Belasco, Deputy Attorney General, for Respondents.

Judith Lerner and Edward P. Scott as Amici Curiae on behalf of Respondents.

## OPINION

**BROWN (Gerald), P. J.**—Petitioners Jane Doe and Betty Roe are mentally ill. Doe has had electroconvulsive therapy (ECT) and may need further voluntary treatments. Roe wants a surgical "Multiple target procedure," or psychosurgery. Petitioner Aden, a licensed California physician is certified by the American Board of Psychiatry and Neurology as a specialist in the treatment of psychiatric illnesses. Dr. Aden is Jane Doe's attending physician. Dr. Brown who is a California licensed surgeon and physician, is Betty Roe's treating physician and surgeon. He specializes in neuro-surgery and is a member of the American Board of Neurological Surgeons and the American College of Surgeons. Petitioner Campbell is a licensed California physician and surgeon, with a specialty in neurology and psychiatry for over 30 years, but he is not certified by the American Board of Psychiatry and Neurology.

The Attorney General, the Director of Health, and the Board of Medical Examiners are respondents.

The law involved in this petition is part of the Lanterman-Petris-Short Act (Welf. & Inst. Code, §§ 5000-5404).[1] The law changes conditions under which psychosurgery and shock treatment can be performed. The changes applicable to persons involuntarily detained and persons voluntarily admitted to state hospitals, private mental institutions, county psychiatric hospitals and certain mentally retarded persons, are:

*Psychosurgery:* (§§ 5325, 5326, 5326.3.)

Patients have the right to refuse psychosurgery and the professional person in charge of the facility may not deny them that right. If a patient refuses consent, it must be entered on the record.

If a patient wants psychosurgery, then the conditions for performing such surgery include:

---

[1]All references to statutes are to the Welfare and Institutions Code unless otherwise stated.

(a) The patient must give written informed consent, dated, witnessed and entered in his record. The consent may be withdrawn at any time. An oral explanation by the doctor is necessary.

(b) The patient must have capacity to consent.

(c) An oral explanation must be given to a responsible relative, guardian or conservator.

(d) The reasons for surgery must be in the patient's treatment record, other treatments must be exhausted and surgery must be critically needed.

(e) Three appointed physicians (two board-certified psychiatrists or neurosurgeons), must examine the patient and unanimously agree with the treating physician's determinations and that the patient has capacity to consent. There must be a 72-hour wait after the patient's written consent before surgery.

*Shock Treatment:* (§ 5326.4.)

If the treating physician feels shock treatments are necessary, he must give an extensive oral explanation to the patient and his relative, guardian, or conservator.

Shock treatments shall be performed only after:

(a) The patient gives written informed consent.

(b) The patient has capacity to consent.

(c) A relative, guardian or conservator has been given a thorough oral explanation.

(d) "Adequate documentation" has been entered in the patient's record. All other treatments have been exhausted and the treatment is critically needed.

(e) There has been a review by three appointed physicians (two board-certified) who agree with the treating physician that the patient has capacity to consent.

If the patient does not have the capacity to consent, shock treatments can be given if conditions (c), (d) and (e) are met.

No shock treatments may be given if the patient is able to give informed consent and refuses.

The bill also provides for civil penalties of $10,000 or license revocation of doctors who violate these sections (§ 5326.5).[2]

Petitioners assert the changes are unconstitutional in certain respects and want a peremptory writ of mandate permanently preventing respondents from enforcing the amendments.

■ Original jurisdiction in this court is proper. The Supreme Court and the Court of Appeal may take original jurisdiction in cases of mandamus, prohibition or certiorari. (Cal. Const., art. VI, § 10.) However, California Rules of Court, rule 56(a)(1) requires: "If the petition might lawfully have been made to a lower court in the first instance, it shall set forth the circumstances which . . . render it proper that the writ should issue originally from the reviewing court . . . ."

Thus, exceptional circumstances must be shown before a reviewing court will take jurisdiction, such as issues of great public import and the necessity for prompt resolution of those issues (*Ramirez* v. *Brown,* 9 Cal.3d 199, 202-203 [107 Cal.Rptr. 137, 507 P.2d 1345]; *Jolicoeur* v. *Mihaly,* 5 Cal.3d 565, 570, fns. 1 & 2 [96 Cal.Rptr. 697, 488 P.2d 1]; *San Francisco Unified School Dist.* v. *Johnson,* 3 Cal.3d 937, 944 [92 Cal.Rptr. 309, 479 P.2d 669]; *State Board of Equalization* v. *Watson,* 68 Cal.2d 307 [66 Cal.Rptr. 377, 437 P.2d 761]; *County of Sacramento* v. *Hickman,* 66 Cal.2d 841 [59 Cal.Rptr. 609, 428 P.2d 593]). In the present proceeding, the constitutionality of a state-wide law is challenged; and the rights of mental patients are dramatically affected by delaying a dispositive decision of this legislation's constitutionality.[3] The case is proper for this Court to exercise original jurisdiction (see *Villa* v. *Hall,* 6 Cal.3d 227 [98 Cal.Rptr. 460, 490 P.2d 1148], vacated 406 U.S. 965 [32 L.Ed.2d 664, 92 S.Ct. 2407], subs. opn. 7 Cal.3d 926 [103 Cal.Rptr. 863, 500 P.2d 887]; *Mooney* v. *Pickett,* 4 Cal.3d 669, 674-675 [94 Cal.Rptr. 279, 483 P.2d 1231]; 6 Witkin, Cal. Procedure (2d ed.) Extraordinary Writs, 1975 Supp., pp. 57-58). The use of a writ of mandate to prohibit the enforcement of an illegal statute is proper where prohibition would not lie.

---

[2]Section 5326 requires denial of rights be entered in a patient's record and reported to the Director of Health. The reports are available to members of the Legislature and county boards of supervisors. Assembly Bill No. 1032 as proposed, extensively amends this bill. Changes have been proposed in procedures for voluntary and involuntary informed consent, confidentiality safeguards and the board.

[3]Section 5001 states the legislative intent of the mental health services includes ending inappropriate, indefinite, and involuntary commitments, and providing prompt evaluation and treatment of mentally disordered persons.

Respondents contend there are issues of fact to be resolved and evidence must be taken on various aspects of the treatments, for example, whether there are sufficient psychiatrists available for review committees and the influence of the consultation procedures on the doctor-patient relationship.

These matters, however, are not necessary facts. The writ challenges the Legislature-dictated changes in how a patient may *consent* to the psychosurgery and shock therapy, not the efficacy of the treatments.

Perhaps the most striking feature of authorities (and case law) in the area dealt with by this legislation is they are quite uniform in acknowledging that the processes by which electroconvulsive therapy and psychosurgery induce therapeutic effects are not fully understood. The two modes of treatment are quite different in several aspects and their relevant characteristics will be considered briefly and separately.

Psychosurgery, as defined in section 5325, subdivision (g), as amended, includes those operations "referred to as lobotomy, psychiatric surgery, and behavioral surgery. . . ." Instructive and persuasive in this area is the case of *Kaimowitz* v. *Department of Mental Health for the State of Michigan,* 2 Prison L. Rptr. p. 433 which does not appear to be reported in an official report. We utilize it as a secondary authority, the citation of which is not prohibited by California Rules of Court, rule 977, prohibiting citation of California cases not certified for publication in the California official reports.

The distinctive feature of such psychosurgical procedures is the destruction, removal, or disconnection of brain tissue in order to modify or control "thoughts, feelings, actions, or behavior" when the tissue is normal or when there is no evidence any abnormality has caused the behavioral disorder.[4] Psychosurgery is also distinguished from "shock" therapy by its *experimental* nature.[5] Psychosurgery is an irreversible

---

[4]The lack of tissue abnormality, or causal relation between an abnormality and character or behavior disorder is the primary feature of the definition in section 5325, subdivision (g)(1), (2) and (3). This characteristic is emphasized in the definitions adopted by the court in *Kaimowitz* v. *Department of Mental Health for the State of Michigan,* civil action No. 73-19434-AW (Cir. Ct. Wayne County, Mich., July 10, 1973) (reported in 2 Prison L.Rptr. 433, 473-474 (Aug. 1973).

[5]*Kaimowitz, supra,* at page 475. This view of the nature of psychosurgery is concurred in by the American Psychiatric Association in their Position Statement of the American Psychiatric Association on Possible Revision of the Standard No. 9 of the April 13, 1972 Decree in *Wyatt* v. *Stickney,* filed in *Wyatt* v. *Hardin* (Civ. Action No. 3195-N-M.D.Ala. Feb. 28, 1975) December 20, 1974, p. 9. Petitioners and amici curiae in support of the petition do not seriously contend otherwise.

alteration of the brain and its functions that presents serious risks to patients, some of which risks are unknown. The court in *Kaimowitz, supra,* at page 475 concluded that the dangers of such surgery are undisputed. Such a procedure often leads to "the blunting of emotions, the deadening of memory, the reduction of affect, and limits the ability to generate new ideas." (*Kaimowitz, supra,* at p. 478.)

"Shock" treatment, more accurately termed "electroconvulsive therapy" (ECT), is the name given to a group of therapies which involves passing electrical currents through the brain in order to induce convulsions. The therapeutic effects of ECT are generally believed to be obtained by the seizure produced by the stimulation of the central nervous system. The risks attending such treatment have been greatly reduced by the use of muscle relaxants and general anesthetics, which greatly reduce the body convulsions that led to bone fractures in the past. The mechanism by which ECT confers its benefits is still unknown, but two facts stand out in almost every discussion of the treatment: first, ECT does relieve symptoms of certain mental illnesses, most notably acute depression, and is widely recognized therapy for obtaining remission of those symptoms; second, ECT has several adverse effects, including memory loss and intellectual disorientation.[6] The extent of memory loss and the risk of permanent memory loss are not fully known or agreed upon, but the fact of memory loss is not questioned. The risk of other adverse effects is possible, since the procedure is still so little understood. Those possible risks include permanent brain damage in the local area of the electrodes and a slowing of brain waves.[7] The outstanding features of ECT, then, are the acknowledged benefits in the treatment of certain illnesses, and the intrusive and possibly hazardous character of the treatment.

The petitioners, and amici curiae in support of the petition for writ of mandate, rest their attack on the amended and added Welfare and Institutions Code sections on several asserted constitutional infirmities: They allege denial of equal protection under the Fourteenth Amendment because of unreasonable classifications of mental patients. They allege the prescribed statutory disclosure to patients of "all of the possible risks and possible side effects" conflicts with the standard set for informed consent in *Cobbs v. Grant,* 8 Cal.3d 229, 245-246 [104 Cal.Rptr.

---

[6]See, generally, Facts About: Electroshock Therapy, National Clearinghouse for Mental Health Information, National Institute of Mental Health, DHEW Publication No. (ADN) 74.88.

[7]The Psychobiology of Convulsive Therapy, pages 273-276, (Fink et al., edits. 1974).

505, 502 P.2d 1], that there need not be disclosure of risks if the patient does not want to know and a limited disclosure if the patient would be so seriously upset he could not "dispassionately weigh the risks of refusing to undergo the recommended treatment;" the procedures for informing the patient so he may consent, and the procedures for obtaining review board approval of the proposed therapy are said to violate due process because the language is unconstitutionally vague. The changes are said to violate substantive and procedural due process because the patient's constitutional rights of privacy, freedom of thought, and access to adequate medical treatment are infringed upon without adequate procedural safeguards or sufficient relation to a compelling state interest.

### A. *Equal Protection*

■ Petitioners' equal protection arguments are without merit. Regulation of intrusive and possibly hazardous forms of medical treatments is a proper exercise of the state's police power. Public health and safety protection in the field of medical practice is an acknowledged, legitimate function of the police power. Licensing of physicians (Bus. & Prof. Code, § 2000 et seq.), regulation of conditions within medical treatment facilities (Health & Saf. Code, § 1400 et seq.; Welf. & Inst. Code, § 7000 et seq.), and regulation of drug administration (Health & Saf. Code, § 11000 et seq.), are examples of the proper exercise of this power (see *Blinder v. Division of Narcotic Enforcement,* 25 Cal.App.3d 174, 181-182 [101 Cal.Rptr. 635]). The provisions of the Lanterman-Petris-Short Act "demonstrate the concern of the Legislature that the *patient's* rights receive full protection at all times," (*Thorn v. Superior Court,* 1 Cal.3d 666, 673-674 [83 Cal.Rptr. 600, 464 P.2d 56]). (Italics added.) The added and amended law is an extension of the protection of those rights and must be viewed as more than the mere regulation of medical procedures for the public health and safety.

The equal protection clause of the Fourteenth Amendment is a limitation on the police power. The Legislature may make a reasonable classification of persons and other activities and pass special legislation applying to certain classes, if the classification is not arbitrary and is based on some difference in the classes having a substantial relation to a legitimate object to be accomplished (*Brown v. Merlo,* 8 Cal.3d 855, 861 [106 Cal.Rptr. 388, 506 P.2d 212, 66 A.L.R.3d 505]). The objective of the challenged law is to insure certain medical procedures are not performed on unwilling patients. The classifications that single out mental patients and two specific procedures are rationally related to that objective.

Mental patients are distinct from other ill patients in two special circumstances. First, their competence to accede to treatment is more questionable than that of other patients. Mental patients' incompetence may not be presumed solely by their hospitalization (§ 5331), but it is common knowledge mentally ill persons are more likely to lack the ability to understand the nature of a medical procedure and appreciate its risks. Second, their ability to voluntarily accept treatment is questionable. The impossibility of an involuntarily detained person voluntarily giving informed consent to these medical procedures is fully treated in *Kaimowitz* v. *Department of Mental Health for the State of Michigan, supra,* 2 Prison L. Rptr. at p. 477, and *Wyatt* v. *Hardin, supra* (Civ. Action No. 3195-N [M.D. Ala. Feb. 28, 1975]). "Voluntary" patients, newly included within the protection of the "Patients' Bill of Rights" (§ 5325) are susceptible to many of the pressures placed on involuntary patients. The Legislature's inclusion of these "voluntary" patients recognizes the fact the "voluntary" label is a creation of the Legislature, and often only means the patient did not formally protest hospitalization.[8] These circumstances make the separate treatment of mental patients clearly rationally related to the objective of insuring their rights to refuse treatment. The special regulation of psychosurgery and ECT is also a reasonable classification because these procedures, associated with *mental* illness, present a great danger of violating the patient's rights.

■ Petitioners and amici in support of the petition assert section 5326.4 conflicts with California law and violates patients' constitutional rights as declared in *Cobbs* v. *Grant, supra,* 8 Cal.3d 229. Petitioners object to the requirement "[a]ll of the possible risks and possible side effects to the patient should he consent" to ECT, be disclosed to the patient as an element of the "informed consent" necessary before treatment. Petitioners do not object to the almost identical language of section 5326.3 referring to the elements of informed consent for psychosurgery. Petitioners rely on *Cobbs* v. *Grant, supra,* 8 Cal.3d 229, contending that decision gives patients the right to *refuse* information.

The court in *Cobbs* was concerned with the patient's right to express an informed consent before medical treatment. The petitioners rely on language which concerns a doctor's defenses to tort actions for battery or negligence. In the context of a malpractice suit, the patient's request to be left uninformed would be a defense to the doctor's nondisclosure. The

---

[8]Gilboy & Schmidt, *"Voluntary" Hospitalization of the Mentally Ill,* 66 Nw. U.L.Rev. 429; Ellis, *Volunteering Children: Parental Commitment of Minors to Mental Institutions,* 62 Cal.L.Rev. 840.

court also said the *only* time a patient should be "denied the opportunity to weigh the risks" is "... where it is evident he cannot evaluate the data, as for example, where there is an emergency or the patient is a child or incompetent." (*Cobbs* v. *Grant,* 8 Cal.3d 229, 243 [104 Cal.Rptr. 505, 502 P.2d 1].) Thus, a patient's request to be left uninformed may provide a doctor a defense to a tort action, but it does not *obligate* or constitutionally coerce the doctor into acceding to the patient's wishes. The Legislature has determined ECT and psychosurgery are such intrusive and hazardous procedures that informed consent is a mandatory prerequisite to treatment. *Cobbs* v. *Grant, supra,* 8 Cal.3d 229, does not prevent such a determination; it provides that, except in the instances of simple procedures, or where the patient is incompetent to make a decision, there is a right to full information. The right to fully informed consent protects the patient's constitutional rights. (See *Kaimowitz* v. *Department of Mental Health for the State of Michigan, supra,* 2 Prison L. Rptr. p. 477; see also *New York City Health & Hosp. Corp.* v. *Stein,* 70 Misc.2d 944 [335 N.Y.Supp.2d 461, 464].)

### B. *Vagueness*

" '[A] statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law.' (*Connally* v. *General Construction Co.,* . . . 269 U.S. 385, 391 . . .)" (*People* v. *Barksdale,* 8 Cal.3d 320, 327 [105 Cal.Rptr. 1, 503 P.2d 257].)

Petitioners contend various provisions of the new statute are so ambiguous they cannot be constitutionally enforced: first, the terms "private mental institution," "psychosurgery" and "shock treatment" (§ 5325); second, the terms of sections 5326.3, subdivision (c) and 5326.4, subdivision (3), which establish elements of informed consent; and third, the terms of sections 5326.3, subdivision (d), and 5326.4, subdivision (d), which refer to the criteria for approval by a review committee.

"Where the requisite certainty is not apparent on the face of the statute the deficiency may be satisfied by 'common understanding and practices' [citations] 'or from any demonstrably established technical or common law meaning of the language in question' [citation]." (*People* v. *Barksdale, supra,* 8 Cal.3d 320, 327.)

Contrary to petitioners' contentions "psychosurgery" and "shock treatment" have established technical meanings. ■ The meaning of "psychosurgery" is evident on the *face* of the statute. It clearly does not refer to surgical procedures other than those used for modification of behavior, thought, or feelings, in the treatment of mental illnesses. ■ "Shock treatment" is an inexact term since it refers to the characteristic of "shock" rather than "convulsion," which is the primary feature of that form of treatment. It is clear, however, the Legislature intended to include electroconvulsive therapy (ECT) within the term "shock treatment" and did not intend to include "defibrillation of the heart" which is not associated with the treatment of mental disorders. It is less clear whether convulsive therapies based on drug-induced convulsions are properly included within the term. "Shock treatment" does not necessarily include all convulsive therapies, although the intention of the Legislature to so include them may be inferred from their similarity to ECT in almost every respect. Because certain drug therapies are referred to as insulin "shock" therapies, it is reasonable to conclude "shock treatment" is not restricted to ECT, and includes both insulin coma therapy and other drug-induced convulsion therapies. .

■ The term "private mental institution" means "acute psychiatric hospital" (Health & Saf. Code, § 1250, subd. (b)), which provides for the care of persons referred to an insitution under division 5 and division 6 of the Welfare and Institutions Code. An institution does not become a "mental institution" merely by providing psychiatric services under Health and Safety Code section 1255, subdivision (e). In addition to its meaning set out in the statute, the term is also commonly understood.

■ The contention the subdivisions of sections 5326.3 and 5326.4, requiring explanations of all of the possible risks, possible side effects, and the degree of uncertainty of the benefits and hazards associated with the procedure, are void for vagueness is also unmeritorious. Whatever may be the wisdom of such a strict standard of disclosure, the statutory language calls for a full explanation to the patient of all relevant information. Thus, the requirement of all possible risks and possible side effects must be read to mean the disclosure of all risks and side effects thought to be associated with these procedures. As the court's opinion in *People* v. *Barksdale, supra,* 8 Cal.3d 320, 328, makes clear, "risk" is a sufficiently well-defined term, and even "substantial risk" is not unconstitutionally vague. *Barksdale* objects to language using a degree of impairment as a standard. Describing the uncertainty of results in terms

of degree is a far cry from determining the degree of harm which is meant by "gravely impair."

■ Petitioners' final concern is with the requirements of sections 5326.3 and 5326.4 that the treating physician give "adequate documentation" of the reasons for the procedure and determine "all other appropriate treatment modalities have been exhausted and . . . this mode of treatment is critically needed for the welfare of the patient." "Adequate documentation" is documentation of sufficient facts for a review committee to make independent determinations on the basis of the record. Mere conclusory statements may not be used as a basis for concurrence. "Appropriate modalities" are any forms of treatment medically appropriate for a *particular* patient with a *particular* condition. Alternative forms of treatment have been "exhausted" when they have been tried and found insufficient. The legislative intent is to make the more radical procedures the treatments of "last resort" and to require medically appropriate alternative therapies be attempted first. Every possible form of therapy need not actually be used on a patient, because not all forms will be considered appropriate for that patient. This is a purely medical determination, which is within a doctor's professional judgment.

■ There is, however, one criterion which is so imprecise this court is compelled to conclude it is impermissibly vague: the requirement a procedure be "critically" needed for the patient's welfare. While the "welfare" of a patient is arguably imprecise, it encompasses the patient's physical well-being, psychological health, ability to function in his society, and ability to attain happiness—a broad range of interests to be considered and protected. The requirement a procedure be "critically" needed for the patient's welfare, however, provides no guide to the degree of need required.

In *People* v. *Barksdale, supra,* 8 Cal.3d 320, the court considered the California Therapeutic Abortion Act, and specifically the language concerning the criteria for approval of an abortion. The most frequently used ground of approval was "a substantial risk that continuance of the pregnancy would gravely impair" the health of the mother (Health & Saf. Code, § 25951, subd. (c)(1)). The court said it was unable to ascertain the "degree of impairment" that would "gravely impair" a prospective abortee's health. For similar reasons, this court cannot ascertain what degree of need is required by a "critical" need.

"Critically" means "in a critical manner." "Critical" means "crucial, decisive"; "in or approaching a crisis"; "of doubtful issue: attended by risk or uncertainty" (Webster's 3d New Internat. Dict., unabridged). "Critical" is also defined as "frought with danger or risk; perilous" (Am. Heritage Dict. of the Eng. Lang. (Morris edit., 1969)). A patient with acute depression and suicidal tendencies would come within the standard if the form of treatment were essential to protect his life. But what of the patient who does not have self-destructive tendencies and is completely dysfunctional psychologically? Does an inability to remain employed or married qualify as a "critical" condition? Must there be a danger of deterioration, or is a stable condition of severe psychosis critical? If all other forms of appropriate therapies have been attempted, has a "critical" need for ECT or psychosurgery been established?

It seems probable the legislative intent was to require a compelling need for these forms of treatment beyond the mere existence of a behavioral or mental disorder. There seems to be a tacit assumption by the Legislature the cure is sometimes more harmful than the disease, and only the most dangerous and harmful conditions should be so treated. Some persons of "common intelligence" may agree an assessment of impending injury, absent prompt treatment, gives rise to a critical need. Others of like intelligence may demand considerably more, or somewhat less. We conclude on its face the "critically needed" criterion is impermissibly vague.

C. *Due Process*

The regulation of ECT and psychosurgery is a legitimate exercise of the state's inherent police power. The state has an interest in seeing that these procedures, like other medical procedures, are performed under circumstances insuring maximum safety for the patient. These two procedures are not identical in their effect on the patient, nor in their acceptance by the medical community, and may be regulated in different ways and to differing extents. The state has an interest in protecting patients from unwarranted, unreasonable and unconsented-to invasions of body and mind. Arrayed against these legitimate state interests are equally valid considerations of rights of privacy, freedom of speech and thought, and the right to medical treatment.[9]

---

[9]On the one hand, out of deference to personal autonomy, the state prohibits involuntary treatment. On the other hand, again out of deference to personal autonomy, the state promotes access to voluntary treatment which restores functionality and thus enhances future autonomy. (See Shapiro, *Legislating the Control of Behavior Control: Autonomy and the Coercive Use of Organic Therapies,* 47 So.Cal.L.Rev. 237).

Petitioners contend the right of privacy is broad enough to include the selection of, and consent to, medical procedures. Although the Constitution does not explicitly mention the right of personal privacy, it has been found in the First, Third, Fourth, Fifth, Ninth and Fourteenth Amendments, and in the penumbra of the Bill of Rights. But "only personal rights that can be deemed 'fundamental' . . . are included in this guarantee of personal privacy" (*Roe* v. *Wade,* 410 U.S. 113, 152, 158 [35 L.Ed.2d 147, 176, 180, 93 S.Ct. 705]). Those fundamental rights include activities relating to marriage (*Loving* v. *Virginia,* 388 U.S. 1 [18 L.Ed.2d 1010, 87 S.Ct. 1817]); procreation (*Skinner* v. *Oklahoma,* 316 U.S. 535 [86 L.Ed. 1655, 62 S.Ct. 1110]); contraception (*Eisenstadt* v. *Baird,* 405 U.S. 438 [31 L.Ed.2d 349, 92 S.Ct. 1029]); family relationships (*Prince* v. *Massachusetts,* 321 U.S. 158 [88 L.Ed. 645, 64 S.Ct. 438]); and child rearing and education (*Pierce* v. *Society of the Sisters of the Holy Names, etc.,* 268 U.S. 510 [69 L.Ed. 1070, 45 S.Ct. 571, 39 A.L.R. 468]; *Meyer* v. *State of Nebraska,* 262 U.S. 390 [67 L.Ed. 1042, 43 S.Ct. 625, 29 A.L.R. 1446]; *Roe* v. *Wade, supra,* 410 U.S. 113, 152-153 [35 L.Ed.2d 147, 176-177]). While the decision to terminate a pregnancy is includable within those "fundamental" rights as an activity closely related to the above activities, we need not decide whether the decision to undergo medical treatment is deserving of constitutional protection in and of itself (cf. *Roe* v. *Wade, supra,* 410 U.S. 113, 209-221), because the right to privacy so clearly includes privacy of the mind.

The right to be free in the exercise of one's own thoughts is essential to the exercise of other constitutionally guaranteed rights. First Amendment rights of free speech would mean little if the state were to control thought. "Our whole constitutional heritage rebels at the thought of giving government the power to control men's minds. . . ." (*Stanley* v. *Georgia,* 394 U.S. 557, 565-566 [22 L.Ed.2d 542, 550, 89 S.Ct. 1243]). Here the state has sought to control neither what is thought by mental patients, nor how they think. Rather, the state is attempting to regulate the use of procedures which touch upon thought processes in significant ways, with neither the intention nor the effect of regulating thought processes, per se. Yet despite the lack of any showing the state has attempted to regulate freedom of thought, this legislation may diminish this right. If so, the legislation can only be sustained by showing (1) it is necessary to further a "compelling state interest" and (2) the least drastic means has been employed to further those interests (*Roe* v. *Wade, supra,* 410 U.S. 113, 155 [35 L.Ed.2d 147, 178]).

Freedom of thought is intimately touched upon by any regulation of procedures affecting thought and feelings. In an effort to protect freedom of thought, the state has put procedural and substantive obstacles in the path of those who both need and desire certain forms of treatment, and in that way their freedom of thought remains impaired because they cannot get treatment. The means of alleviating mental disorders generate their own kinds of fear and misunderstanding. This attitude touches our public affairs; the fact of treatment alone may impair our confidence in people of unquestioned talent and industry. Psychosurgery and (ECT) are viewed, rightly or wrongly, as drastic, radical forms of treatment compared to psychotherapy or drug therapy, and indicative of more severe illness. Public exposure, or even disclosure to limited numbers of government representatives, may have a chilling effect on patients' efforts to undergo these treatments, thereby restricting their freedom of thought. Some patients will be denied treatment as a natural and intended result of this legislation. Although the reasons for such denials may be the patients' own best interests, such regulation must be justified by a compelling state interest.

As previously explained, there are three changes because of the new legislation: First, voluntary patients as well as institutionalized mentally retarded persons are included within the mental patients' bill of rights of the Lanterman-Petris-Short Act. This change recognizes the fact that "voluntary" and "involuntary" labels do not always indicate the voluntariness of a specific patient. Second, the denial of patients' rights for good cause (§ 5326) was made inapplicable to psychosurgery and "shock treatment" by requiring the informed consent of the patient prior to treatment. To this end, the Legislature defined the contents of informed consent. The purpose was to insure consent was competent, informed, and voluntary. Third, a review procedure was established to determine the patient's competence and the necessity and appropriateness of the proposed treatment. The review procedure was also established to approve the administration of "shock treatment" to patients who were found incompetent to give or withhold consent.

Additionally, the new law requires informing a "responsible relative," as well as the patient, of the risks of treatment to obtain informed consent (§ 5326.3). In order to control abuse of denials of patients' rights, a system of reporting is established by section 5326.

Thus, the state's interests, as expressed in the challenged law, may be summarized as the protection of the right to refuse treatment and the

prevention of unnecessary administration of hazardous and intrusive treatments. The test of the constitutionality of these provisions will be whether each of them furthers a compelling state interest and is necessary to accomplish the purpose.

■    The provision that a "responsible relative" be informed of the eight items constituting "informed consent" before the treatment be administered is a violation of the patient's right of privacy and the right to confidentiality established by section 5328. The disclosure of the nature and seriousness of the patient's disorder is a clear infringement of the patient's right of privacy and no countervailing state interest is apparent. Because no standing to assert the patient's rights is granted to the relative, it is doubtful this disclosure furthers the protection of patients' rights or prevents unnecessary treatment. Thus, the requirement of such disclosure is an unconstitutional invasion of the patient's right to privacy.

■    The establishment of a reporting system seeking to control possible abuses of patients' rights would be a clear invasion of the patients' privacy if the patients' identities were disclosed. The state has a valid interest in the prevention of denials of patients' rights without good cause, and such a reporting system is a reasonable means of achieving that end. To further that end, it must be possible to identify which patients' rights are denied, both to correct individual wrongs and to correct general patterns of abuse. Thus, the report to the Director of Health must provide for identification of individual treatment records, as in section 5326. Although such reports are to be made available to members of the state Legislature, or a member of the county board of supervisors, under the new procedure, those people need not be able to identify individual patients. No report may disclose a patient's identity other than by a code which refers to the patient's treatment record. Members of the Legislature and members of the county boards of supervisors are able to request information pertaining to a denial of rights in such treatment records, but they are not to be permitted to learn the patient's identity or to acquire information other than that pertaining to a denial of rights.

Information in a treatment record about the denial of rights to a patient is also available to the individual patient, his attorney, conservator, or guardian. The disclosure of such information is a limited infringement upon the patient's right to privacy, but it is also one of the most effective possible remedies to abuses. Because only information

pertaining to a denial of rights is permitted, and those most likely to assert the patient's rights are the recipients of the information, we interpret that provision of section 5326 as a constitutionally permissible limited infringement on the confidentiality of a patient's identity.

Sections 5326.3 and 5326.4, listing items of information that must be orally explained to the patient in order to get his informed consent before treatment, constitute a minimal invasion of privacy. An oral explanation only invades the patient's privacy to the extent the treating physician would not otherwise be in possession of such information. The information is not recorded in the patient's record and is not made available to any review committee. The explanation does insure the patient gives consent in a knowing, intelligent, and voluntary manner. The state's interest in protecting the patient's right to refuse treatment could not be accomplished by any measure short of such disclosure, and the procedure is constitutional.

The most difficult aspects of this legislation involve the mandatory review of proposed treatments by a review committee. As discussed above, the two forms of treatment are distinct and may be regulated to differing degrees. An analysis of the review procedures involved in each form of treatment will be considered separately.

Consent to psychosurgery is regulated and applied differently to three groups of patients: incompetent, involuntary, and all others. The state's interest in protecting patients from unconsented-to and unnecessary administrations of psychosurgery clearly justifies a review procedure which insures the competence of the patient and the truly voluntary nature of his consent. The incompetent patient is incapable of consenting to such a procedure, and the state's interest in protecting him from such procedures fully justifies the attendant invasion of privacy. Although there are substantial problems of procedural due process involved, a review of a patient's competence by a review committee is constitutional where, as here, there is reason to suspect incompetence.

The involuntary patient presents the dilemma of either prohibiting the administration of psychosurgery to such patients (see *Kaimowitz v. Department of Mental Health for the State of Michigan, supra,* 2 Prison L.Rptr. 433), or providing for a substitute decision-making process (see *Wyatt v. Stickney,* 344 Fed.Supp. 373). Because the voluntariness of such a patient's consent can never be adequately confirmed, the establishment of a review committee to make the treatment decision for the patient is

justified by the state's compelling interest in preventing involuntary administration of psychosurgery.

The substantive review of proposed treatments for competent and voluntary patients is a different problem. Once the competency of the patient and voluntariness of the consent is confirmed, what interest of the state can justify the substitution of the review committee's decision for that of the patient and his physician?

The hazardous, experimental nature of psychosurgery is a legitimate reason for the state to regulate its use as a treatment of last resort. Requiring unanimity by the review committee insures each approved treatment is an appropriate use of an experimental procedure. The importance of assuring that consents to psychosurgery be voluntarily given by informed, competent mental patients, plus the need to regulate an experimental procedure, justify the Legislature's decision to remove these considerations from the sole discretion of the treating physician. There are sound reasons why the treating physician's assessment of his patient's competency and voluntariness may not always be objective, and he may not necessarily be the best or most objective judge of how appropriate an experimental procedure would be. Because the consequences to the patient of such a procedure are so serious, and the effects he may suffer are so intrusive and irreversible, tort damages are totally inadequate. The need for some form of restraint is a sufficiently compelling state interest to justify the attendant invasion of the patient's right to privacy. That right to privacy is not absolute (*Roe* v. *Wade, supra,* 410 U.S. 113, 154-155 [35 L.Ed.2d 147, 177-178]) and must give way to appropriate regulation.

The new regulatory scheme as it applies to "shock treatment" is almost identical to the regulatory system for psychosurgery. As previously noted, the oral explanation to the patient required by section 5326.4 is constitutional. The review procedures of section 5326.3, as applied to involuntary or incompetent patients, function the same as those under section 5326.4, and the review is also constitutional. These procedures for involuntary patients provide for a substitute decision-making process because of the difficulty of acquiring a truly voluntary consent to such a procedure (see *Kaimowitz, supra,* and *Wyatt* v. *Stickney, supra,* 344 F.Supp. 373). In the case of incompetent patients, the substitute decision-making process permits the use of this form of treatment for patients who cannot consent for themselves. These applications of section 5326.4 are constitutional for the reasons previously discussed.

■ The thorny question in section 5326.4 concerns the application of the review system to voluntary, competent patients. As already noted, the state has a compelling interest in assuring the competency and voluntariness of patients who undergo this form of treatment. To this end, the review system is compatible with due process. However, once the competency of a voluntary patient has been confirmed, and the truly voluntary nature of his consent is determined, the state has little excuse to invoke the substitute decision-making process. "Shock treatment," or more precisely ECT, is not an experimental procedure, nor are its hazards as serious as those of psychosurgery. Petitioners' reliance on *Doe v. Bolton,* 410 U.S. 179 [35 L.Ed.2d 201, 93 S.Ct. 739] is well-founded. Where informed consent is adequately insured, there is no justification for infringing upon the patient's right to privacy in selecting and consenting to the treatment. The state has varied interests which are served by the regulation of ECT, but these interests are not served where the patient and his physician are the best judges of the patient's health, safety and welfare.

Therefore, insofar as section 5326.4 applies to competent and voluntary patients who have given competent, voluntary and informed consent, it is unconstitutional. Substantive review is proper for involuntary or incompetent patients because there is a need for a substitute decision-maker. Any possible need which exists for the voluntary and competent patient cannot prevail in the face of the serious infringement to the patient's right to privacy as guaranteed by *Roe* v. *Wade, supra,* 410 U.S. 113 and *Doe* v. *Bolton, supra,* 410 U.S. 179.

■ Petitioners and amici also assert the new legislation denies procedural due process because it denies substantive rights without adequate procedural safeguards.

"The fundamental requirement of due process is an opportunity to be heard upon such notice and proceedings as are adequate to safeguard the right for which the constitutional protection is invoked." (*Anderson Nat. Bank* v. *Luckett,* 321 U.S. 233, 246 [88 L.Ed. 692, 705, 64 S.Ct. 599, 606, 151 A.L.R. 824].) The new procedures provide an inadequate hearing for patients on the issues of competency and voluntariness, and for these reasons are found lacking in procedural due process.

Relying upon *Jacobson* v. *Massachusetts,* 197 U.S. 11 [49 L.Ed. 643, 25 S.Ct. 358], petitioners also assert a constitutional right to care for one's own health is unconstitutionally invaded by the new procedure. We

reject the notion the case recognizes any such fundamental right. The court deciding *Jacobson* held the vaccination of citizens against smallpox is a valid exercise of the state's police power. Petitioners also unmeritoriously assert a constitutional right to medical treatment (*Rouse* v. *Cameron,* 373 F.2d 451 [125 App.D.C. 366]). Where this right is concerned, due process requires only that the state, once it has institutionalized a person for the purpose of treatment, provide reasonable treatment or release the person (see *Wyatt* v. *Aderholt,* 503 F.2d 1305, 1312-1314). In the present case, any denial of treatment is tantamount to a finding that that particular form of treatment is not reasonable. It is not a denial of any or all treatment.

■ Petitioners contend the requirement two members of the review committee be certified constitutes an unconstitutional infringement upon the doctor-patient relationship as guaranteed by *Doe* v. *Bolton, supra,* 410 U.S. 179. *Doe* struck down the requirement that hospitals in which abortions were to be performed must be accredited by the Joint Commission on Accreditation of Hospitals, as violating the Fourteenth Amendment, because the accreditation requirement was not based on differences "reasonably related to the purposes of the Act in which it is found" (*Morey* v. *Doud,* 354 U.S. 457, 465 [1 L.Ed.2d 1485, 1491, 77 S.Ct. 1344]). Here, the board certification is based on the fact the treatment procedures are hazardous and intrusive in a way other procedures are not. Furthermore, psychosurgery is considered experimental. These treatment aspects call for a higher level of competence and training where the physician must exercise his judgment in place of the patient's. The requirement is constitutional.

CONCLUSION

The validity of section 5326 except for references to sections 5325, subdivision (f) and 5326.4 is not challenged. With the exception of section 5325, subdivision (g), the unchallenged portions of section 5326 and the remainder of section 5325 were enacted before the objectionable amendments. They list patient rights, require the list to be posted, regulate the denial of those rights, and provide for release of information. They do not relate to the conditions for allowing psychosurgery or shock treatment, and can stand alone. Section 5325, subdivision (g) defines psychosurgery for the purpose of disallowing the procedure when the patient refuses, which is a valid legislative purpose under the police power, a result which is unaffected by our declaration other sections are unconstitutional.

Section 5326 is constitutional when the references to section 5325, subdivision (f) and 5326.4 are excised.

Section 5326.3 is unconstitutionally vague insofar as the criterion for treatment is "critically needed for the welfare of the patient"; the requirement of informing a "responsible relative" is an unconstitutional invasion of the patient's right to privacy; and the failure to provide for adequate notice of hearing is a denial of procedural due process.

Section 5326.4 has the same constitutional infirmities as section 5326.3, and, in addition, is unconstitutional because it subjects the decision of competent, voluntary patients to substantive review.

To excise the constitutionally infirm provisions from sections 5326.3 and 5326.4 would involve a wholesale rewriting of those sections, a task not properly undertaken by a court (*People* v. *Stevenson,* 58 Cal.2d 794, 798 [26 Cal.Rptr. 297, 376 P.2d 297]). We thus hold sections 5326.3 and 5326.4 are unconstitutional in their entirety.

Section 5326.5 fails because it is a penalty provision dependent on sections 5326.3 and 5326.4 (*People* v. *Stevenson, supra,* 58 Cal.2d 794, 798).

For the reasons stated, we declare the reference to sections 5325, subdivision (f) and 5326.4 in section 5326, sections 5326.3, 5326.4 and 5326.5 invalid.

Accordingly, let a peremptory writ of mandate issue.

Ault, J., and Cologne, J., concurred.

A petition for a rehearing was denied May 20, 1976, and the opinion and the judgment were modified on May 20, 1976, and June 18, 1976, to read as printed above.