Filed 4/15/26  Donor Network West v. Superior Court CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| DONOR NETWORK WEST, INC., <br><br> Petitioner, <br><br> v. <br><br> THE SUPERIOR COURT OF MERCED COUNTY, <br><br> Respondent; <br><br> THE COUNTY OF MERCED, <br><br> Real Party in Interest. | F090900 <br><br> (Super. Ct. No. 202504900) <br><br><br> **OPINION** |

ORIGINAL PROCEEDINGS; petition for writ of mandate.

Buty & Curliano, Madeline Buty and Collin W. Wayne, for Petitioner.

No appearance for Respondent.

Forest W. Hansen, County Counsel, and Jenna M. Anderson, Deputy County Counsel; Miller Barondess, Eleanor S. Ruth and Nadia A. Sarkis, for Real Party in Interest.

-ooOoo-

Donor Network West, Inc. (Donor Network) is an organ procurement organization (procurement organization) that facilitates organ donation in Northern California and coordinates the anatomical gift process for eligible organ donors.  After becoming aware

that a crime victim on life support was an organ donor and likely to die, Donor Network advised the Merced County Coroner's Office (county coroner) of this fact, but the county coroner denied the donation of any organs. Law enforcement obtained a search warrant that ordered the victim's body to be turned over to the county coroner or law enforcement when the hospital took the victim off life support.

In a petition for writ of mandate filed directly in this court, Donor Network asked us to stay the execution of the search warrant, vacate the search warrant, and issue a writ mandating the county coroner and its agents to proceed with organ procurement procedures as provided in the Uniform Anatomical Gift Act (Health & Saf. Code,[1] § 7150, et seq.) (the Act). Although we declined to issue a stay and recognized the county coroner's obligations under the Act in this case may soon be moot, we issued an order to show cause directing real party in interest, the County of Merced (county), to file a return addressing what mandatory duties a coroner owes under the Act before denying removal of an organ for donation.

After reviewing the county's return and Donor Network's reply, we have determined that we should have exercised our discretion not to issue the order to show cause. Accordingly, we will discharge the writ without further proceedings as having been improvidently granted, the effect of which is that our decision is not law of the case on the issues presented in the petition and this order is final immediately. (*Countrywide Home Loans, Inc. v. Superior Court* (1997) 54 Cal.App.4th 828, 829-830, 833 (*Countrywide Home Loans*).)

## FACTUAL AND PROCEDURAL BACKGROUND

On December 13, 2025, Donor Network became aware that Anthony Martinez, who was a registered organ donor, was in the hospital with a gunshot wound to his head

---

[1] Undesignated statutory references are to the Health and Safety Code.

and was likely to die. It was determined that Martinez, who was on mechanical ventilation, met the criteria to be an organ donor.

After receiving the information concerning Martinez, Donor Network contacted the law enforcement agency investigating Martinez's death, the Los Banos Police Department, to advise that Martinez was an anatomical donor and inquire about organ donation. The police department directed Donor Network to the county coroner's office. Since April 2023, the county had contracted with NAAG Forensic PC (NAAG), a full-service forensic medicine and pathology consultant, to provide medical examiner and coroner services. In this capacity, NAAG experts act as the chief medical advisors within the elected office of county coroner. Donor Network contacted the county coroner's office to notify Dr. Sam Andrews, a NAAG forensic pathologist primarily charged with fulfilling the county's coroner obligations, that Martinez was an anatomical donor and to discuss organ donation procedures.

According to Jaclyn Manzenado, Donor Network's senior director of donation development, Andrews refused to discuss the matter with her office. She asserted she made multiple efforts to contact NAAG to collaborate on the recovery of organs from Martinez. She first contacted Deputy Eliana Silva of NAAG to report on the potential organ recovery, but Manzenado understood Silva did not have any authority on how to proceed. She then sent Martinez's medical records to Silva and Andrews. After follow-up communications with Silva, Silva texted Manzenado the following: " 'Dr. Andrews said given that is a homicide, he will not be able to donate.' " Manzenado tried to reach Andrews by telephone multiple times and tried to set up a group conference with the county coroner's office, NAAG, and the Los Banos Police Department via text with a police sergeant and by email, but Andrews did not respond.

The county, however, denies that Andrews refused to discuss the matter. According to the county, Andrews informed Donor Network that, based on his review of

3.

the medicolegal issues and information from law enforcement, this was a case in which an autopsy was required, and organ removal would interfere with the autopsy and criminal investigation. The county asserted Donor Network attempted to persuade Andrews that it could try to preserve necessary evidence during surgery to retrieve Martinez's organs, and began to prepare Martinez's body for organ retrieval, thereby prolonging the natural course of death. The county further asserted that Donor Network delayed extubation even after the treating physicians determined that life support measures should be withdrawn and hospital executives told Donor Network to either obtain a court order or cede to the county coroner's directions. According to the county, the county coroner's office evaluated Donor Network's assessment but concluded it overlooked and ignored significant forensic concerns.

On December 13, 2025, the county's law enforcement partners investigating the homicide obtained a search warrant from the Merced County Superior Court.[2] The warrant ordered that "Martinez's … body be turned over to the care and custody of any Merced County Sheriff's Office or Coroner's Office or Stanislaus County Coroner's Office" when the hospital took Martinez off life support. The search warrant further ordered that from the time of the signing of the warrant "there shall be no tampering of Anthony Martinez's body while he is on the ventilator by anyone with the purpose of organ harvesting or organ donation." (Emphasis omitted.) Neither Donor Network nor the hospital were present at a hearing on the search warrant, and they were not given an

---

[2] According to the county, the search warrant was supported by a six-page affidavit from a police department investigator that detailed the affiant's personal knowledge of the circumstances of Martinez's death, the suspicion of murder, the identity and the whereabouts of individuals suspected to be involved with the murder, among other known facts and beliefs. The affidavit was not sent to Donor Network or the hospital because it contained sensitive and confidential information regarding an ongoing homicide investigation. Donor Network never sought disclosure of the full search warrant and affidavit.

opportunity to provide a written response to the search warrant application. The search warrant was not served on Donor Network. Rather, the hospital told Donor Network about the warrant and provided it with three pages of the nine-page search warrant.

On December 15, 2025, Manzenado received an email from Dr. Evan Matshes, NAAG's medical director and chief forensic pathologist. Matshes stated he was writing to advise that he would not meet with Donor Network regarding the case. Matshes explained: "The medicolegal authority has rendered a final determination denying organ and tissue donation in this matter. That determination is not provisional, negotiable, or subject to reconsideration. It was reached based on the known and suspected circumstances of death, including the allegation of homicide, and the overriding obligation to preserve evidence necessary for a complete death investigation and any resulting criminal proceedings. [¶] Despite clear communication of this denial, [Donor Network's] continued actions – specifically, the ongoing prevention of extubation after donation has been refused – are medically and forensically inappropriate. Prolonged artificial support under these circumstances materially alters postmortem findings, accelerates biologic degradation, and risks compromising critical evidence. This is not an abstract concern; it directly undermines the integrity of the medicolegal investigation and the interests of justice. [¶] Accordingly, any further delay attributable to donation-related processes or influence is unacceptable. Continued interference after a clear denial has been issued placed D[onor] N[etwork] in direct conflict with the Sheriff-Coroner's statutory authority and the forensic pathologist's duty to preserve evidence."

The email went on to state: "For clarity: [¶] 1. Organ and tissue donation in this case is denied. [¶] 2. No further discussion is required or authorized. [¶] 3. [Donor Network] is not to take any action that delays extubation or otherwise interferes with the natural course of death once withdrawal of care is authorized by the treating team and family." The email concluded: "This correspondence serves as formal notice that any

additional actions which delay extubation or contribute to degradation, loss, or contamination of evidence will be documented contemporaneously and addressed through appropriate legal and administrative channels."

***The Petition for Writ of Mandate***

The following day, December 16, 2025, Donor Network filed a petition for writ of mandate in this court asking us to stay execution of the search warrant and issue a writ directing the superior court to vacate the search warrant and mandating that the county coroner and its agents proceed with the organ procurement procedures as designated by section 7151.20, subdivision (d) of the Act.[3] Specifically, Donor Network argued the county coroner did not comply with the Act's requirement to cooperate with it[4] and the county coroner's decision to deny organ procurement without examining the body did not comply with the Act, as the Act requires that decision to be made during organ removal surgery.

Donor Network asserted writ relief was warranted because: (1) it did not have an adequate legal remedy, as the Penal Code does not provide a procedure for a third party to challenge issuance of a search warrant; (2) an original writ in this court appeared to be the only recognized legal mechanism to challenge the search warrant; and (3) a ruling on

---

[3]     Section 7151.20, subdivision (d) provides:  "If a county coroner is considering withholding one or more organs of a potential donor for any reason, the county coroner, or his or her designee, upon request from a qualified organ procurement organization, shall be present during the procedure to remove the organs.  The county coroner, or his or her designee, may request a biopsy of those organs or deny removal of the organs if necessary.  If the county coroner, or his or her designee, denies removal of the organs, the county coroner may do any of the following:  [¶]  (1) In the investigative report, explain in writing the reasons for the denial.  [¶]  (2) Provide the explanation to the qualified organ procurement organization."

[4]     Section 7151.10, subdivision (a) of the Act provides:  "A county coroner shall cooperate with procurement organizations to maximize the opportunity to recover anatomical gifts for the purpose of transplantation, therapy, research, or education."

the petition would provide direction to the county coroner on how best to comply with California law.

The petition was supported by the declarations of Manzenado and Dr. Mark Super, the former chief medical examiner for the county coroner's office who opined generally about his experience coordinating retrieval and donation procedures under the Act. Super stated that during his tenure from 2012 to 2023, he "always found it possible to release all cases when organ donation was an option and loss of evidence was never a risk in the organ recovery procedure," and if evidence gathering or preservation were needed, the procurement organization made things available to the pathologist to augment the investigation such as additional imaging or scans, bedside external exam, and photography. (Emphasis omitted.) Super opined that if a pathologist had "any further concerns about the impact of the organ recovery on the ability to gather or preserve evidence," the Act "requires the pathologist to attend the organ recovery to visualize the organs," which is the only way a pathologist may restrict the recovery of organs for transplant. Super asserted there had "never been a protocol for blanket restriction of the opportunity to save lives through organ donation based on the manner of death, i.e., homicide."

### The Preliminary Opposition and Reply

The next day, the county filed a preliminary opposition supported by a declaration from Matshes. The county argued the petition should be denied in part because section 7151.20 makes organ removal contingent on the coroner's authorization and permits release of the body where an autopsy is required only if the coroner determines organ removal will not interfere with the investigation or autopsy. The county further argued section 7151.20 did not impose a mandatory, ministerial duty on coroners.

In his declaration, Matshes asserted that NAAG and its physicians strongly support organ and tissue donation and "routinely facilitate donation in medicolegal cases

7.

where donation can occur without compromising evidentiary integrity or the defensibility of the death investigation." Matshes denied that NAAG applied a categorical approval or denial policy to classes of cases; instead, all donation decisions are made on a case-by-case basis, grounded in the specific facts, injuries, investigative posture, and evidentiary needs of each death."

Matshes asserted this approach was "consistent with the published position of the National Association of Medical Examiners (NAME), which supports organ and tissue donation in medicolegal cases while affirming that donation must not compromise evidence preservation, determination of cause and manner of death, or the integrity of the forensic investigation," and "with NAME's long-standing position that forensic pathologists must remain independent of external institutional pressures, as such pressures risk introducing error and bias into medicolegal death investigations."[5]

Matshes asserted that NAAG and the sheriff-coroner's office implemented a more formalized and constrained engagement structure with Donor Network, particularly once a forensic determination was made, to be protective and risk-mitigating rather than punitive. This was because, "[i]n prior medicolegal cases, [Donor Network] personnel provided incomplete, inaccurate, or misleading information relevant to forensic decision-making, and in some instances proceeded in ways that resulted in degradation, loss, or contamination of biological evidence prior to completion of the death investigation." Matshes claimed "[t]hese incidents caused demonstrable harm to forensic investigations, and materially increased risk to the integrity of criminal and civil proceedings."

Matshes asserted this operational posture did not alter the requirement that each donation request be evaluated on its own forensic merits but instead governed how

---

[5] The following exhibits are attached to the declaration: (1) an August 2019, NAME "Position Statement, Medical Examiner Release of Organs and Tissues for Transplantation"; and (2) a NAME position paper on "Medical Examiner, Coroner, and Forensic Pathologist Independence."

communication and compliance were managed.  Matshes asserted NAAG interfaces with Donor Network across multiple California jurisdictions and denial of donation was the exception rather than the rule.  Matshes took exception to any suggestion that NAAG or its physicians opposed donation, asserting it was inconsistent with the operational reality of NAAG's daily forensic practice and misrepresented the balance of decisions.

In Matshes's opinion, organ donation impeded the ability to examine the brain where, as here, a suspected homicide victim has a gunshot wound to the head.  Matshes explained that a "complete and uncompromised medicolegal death investigation" is required, including examining the brain, which is "uniquely vulnerable to degradation with the passage of time, early healing responses, progressive coagulopathy, and invasive interference in the operating room, and once disrupted cannot be reliably reconstructed or reinterpreted."  Matshes further explained that organ donation following brain death introduces progressive brain degradation and can lead to lost evidentiary information.

Matshes asserted a determination was made to deny organ and tissue donation in this case after review of the known and suspected circumstances of death and consistent with NAAG's structured forensic framework and NAME guidance.  Matshes declared that determination was "final, non-negotiable, and based solely on forensic necessity to preserve evidentiary integrity and ensure a defensible death investigation."  The decision was substantially driven "by the recognition that organ donation would accelerate destruction of the brain and permanently deprive the investigation of critical evidence" that could only be obtained by autopsy.  Matshes opined that forensic adequacy could not have been achieved through inspection or review of organs in the operating room because the functional status of transplantable organs was not in dispute; rather, the forensic objectives were to prevent disruption or loss of trace evidence and patterned injury analysis, limit further damage to the brain, and minimize the interval between brain death determination and operative intervention.  Matshes asserted the decision was not based

on opposition to organ or tissue donation, or on the refusal to collaborate, but rather on the obligation "to prevent irreversible evidentiary loss in a suspected homicide involving brain trauma."

Matshes stated that Donor Network was informed that donation was denied and further discussion was not authorized because additional information or negotiation would not alter the forensic conclusion. Matshes declared efforts that delayed extubation after death determination were medically inappropriate and forensically harmful. Matshes opined that the statutory requirement for coroner attendance in the operating room applied only when the coroner was considering withholding one or more organs while permitting others to be recovered, not when the coroner had already determined, based on forensic necessity, that organ recovery should be denied in its entirety. He further opined that attendance during recovery was contemplated as a safeguard when the coroner's decision was unresolved, not as a prerequisite to denial.

On December 18, 2025, Donor Network filed a verified reply in support of its petition, in which it asserted the Act requires a corner who wants to deny organ procurement to do so in person with an organ-by-organ consideration. Donor Network further argued the county failed to engage in its mandatory duty to collaborate with Donor Network.

***The Order to Show Cause***

Later, on December 18, 2025, we issued an order to show cause in which we denied Donor Network's request for stay of the search warrant and ordered the county to show cause why the other relief prayed for in the action should not be granted. In so ordering, we stated we recognized the issue presented by Donor Network addressing a county coroner's obligations under the Act may soon be moot, but we believed the controversy was one of broad public interest that was likely to recur. We directed the county to file a return that should "specifically address the mandatory duties owed by a

10.

coroner under the Uniform Anatomical Gift Act before denying the removal of an organ for donation."

### The County's Return

The county filed a return in which it asked us to either:  (1) dismiss the petition, as it seeks only an advisory opinion on an issue of first impression as an original matter without any underlying superior court proceedings; or (2) enter an order confirming the county coroner's exclusive jurisdiction to custody and control of a decedent's body under the Act.

On the first point, the county argued Donor Network could have sought relief in the superior court by either:  (1) moving to quash and traverse the search warrant; (2) moving ex parte for a temporary restraining order in conjunction with a writ of mandate arguing the Act compelled the coroner to authorize and attend organ retrieval surgery even where the coroner has concluded it would interfere with the death investigation; or (3) seeking declaratory relief construing the parties' rights and obligations under the Act.  The county asserted that while this case involves a question of statutory construction, it also involves factual issues on conflicting evidence that should be resolved in the superior court.

On the second point, the county argued the county coroner retains ultimate authority to deny organ retrieval surgery that interferes with the death investigation and section 7151.20, subdivision (d) should be read not as commanding a mandatory duty but rather as authorizing surgery only if the coroner determines that donation of some or all organs will not impede the investigation.  The county contended that while section 7151.15, subdivision (a) contains a broad policy objective of cooperation between a coroner and a procurement organization to maximize the opportunity for organ recovery for transplantation, the statute does not impose a mandatory duty, and section 7151.20,

11.

subdivision (d), does not require a coroner to participate in organ retrieval surgery before denying removal on an organ-by-organ basis in every case.

***Donor Network's Reply***

Donor Network filed a reply with a supplemental declaration from Manzenado concerning her attempts to collaborate with the coroner, and a declaration from Victor W. Weedn, M.D., J.D., who is a forensic pathologist and attorney with more than 40 years of experience in forensic pathology and medicolegal death investigation and the creator of NAME's inspection and accreditation program.

As for the availability of writ relief, Donor Network contended that while it considered bringing a motion to quash the search warrant in the superior court, it did not believe that the Penal Code gave it standing to file such a motion. Instead, it sought a writ of mandate in this court because it believed that was the best legal remedy available. Donor Network asserted writ relief is available because the county coroner has a mandatory duty to collaborate with it regarding organ donation and to perform its ministerial duty of coming to the operating room to determine which organs it would deny so it could investigate the homicide.

Weedn asserted in his declaration that the actions of the county and the forensic pathologists in this case prevented the recovery of five vital organs that were potentially and likely lifesaving, including a kidney that was directed to be transplanted in Martinez's uncle, who is on a transplant wait list. Weedn opined it was common practice and a requirement in California and other states with similar statutes for: (1) forensic pathologists to attend the recovery of organs and base any denial on a reasoned observation of the body and organs; and (2) a procurement organization to collaborate and communicate when a prospective donor is identified in a case under the coroner's jurisdiction.

12.

Weedn further opined the actions of the county and forensic pathologists in this case did not align with the prevailing standards and practices of the medicolegal death investigation community across the United States. While Weedn did not conduct a medicolegal investigation into the circumstances surrounding the potential donor's death in this case, he did not know of any case involving a gunshot wound to the head in which whole-organ donations were denied.

Weedn found the notion that organ recovery would have jeopardized forensic concerns in this case to be generally untenable. He disagreed with Matshes's assertion that denial was necessary to prevent the loss of trace evidence, explaining that a determination of cause and manner of death can be made without any trace evidence and after several days of delay. Further, had the coroner communicated with Donor Network, an external examination and trace evidence collection could have been conducted in the hospital before the recovery operation, an MRI could have been performed within hours, and the recovery operation could have been performed within 24 hours. Weedn explained that communication and collaboration minimize the interval between brain death determination and operative intervention.

Weedn opined the county coroner's actions in this case did nothing to advance the forensic investigation, as seeking a criminal search warrant appeared to have caused the very delays the coroner was concerned about. Weedn asserted Matshes's email did not constitute communication and cooperation and failed to follow the norms of the medicolegal death investigation community. In Weedn's opinion, even if the county had good cause to deny one or more organs, the county coroner failed to attend the organ recovery operation as required by statute, which defeated the statute's intent to promote organ recovery and prevent needless denials.

Finally, Weedn opined that a gunshot to the head should never prevent the recovery of organs below the neck and in this case, those organs should have been

13.

released for transplantation, which would not have resulted in the loss of significant forensic evidence. Weedn explained that the medicolegal investigation of a death of an organ donor requires vigorous, mutual collaboration between the forensic investigators and the procurement organization and if, after the exchange of information, there is a reason for the pathologist to consider denial, the pathologist must attend the recovery.

## **DISCUSSION**

Donor Network invokes the original jurisdiction of this court, seeking a writ of mandate ordering the county coroner and its agents to comply with the organ procurement procedures of section 7151.20, subdivision (d) of the Act. (Cal. Const., art. VI, § 10; Cal. Rules of Court, rule 8.485.)[6] Donor Network is concerned that the county coroner's conduct "appears to be the beginning of a new pattern where collaboration is becoming non-existent and the [c]oroner is refusing to comply with the law." Donor Network asks us to order, consistent with section 7151.20, subdivision (d), that in all future cases where the county coroner is considering withholding one or more organs of a potential donor, upon the qualified organ procurement organization's request, the coroner must be present during the procedure to remove the organs before denying removal of any organ. Donor Network asserts that the county coroner may not reach a final decision to deny recovery, as the coroner did in this case, until the coroner is in the operating room during the organ removal procedure.[7]

---

[6] Article VI, section 10 of the California Constitution provides, in pertinent part, that the Supreme Court and courts of appeal have "original jurisdiction in proceedings for extraordinary relief in the nature of mandamus, certiorari, and prohibition."

California Rules of Court, rule 8.485(a) provides, in pertinent part, that "the rules in this chapter govern petitions to the Supreme Court and Court of Appeal for writs of mandate, certiorari, or prohibition, or other writs within the original jurisdiction of these courts." Further references to rules are to the California Rules of Court.

[7] Donor Network also originally asked us to issue a writ directing the superior court to vacate the search warrant. That issue is now moot.

14.

Ordinarily, applications for writs of mandate should be made first to the superior court. (*Roma Macaroni Factory v. Giambastiani* (1933) 219 Cal. 435, 436-437.) While an appellate court has the power to exercise original jurisdiction over a writ of mandate without an application to a lower court, it will exercise such jurisdiction "only under exceptional circumstances, i.e., 'where some emergency exists or the public welfare is involved.' " (*Orange County Employees Assn., Inc. v. Superior Court* (2004) 120 Cal.App.4th 287, 297-298.) The issues presented must be of " 'great public importance and must be resolved promptly.' " (*Clean Air Constituency v. California State Air Resources Bd.* (1974) 11 Cal.3d 801, 808 (*Clean Air Constituency*); *County of Sacramento v. Hickman* (1967) 66 Cal.2d 841, 845.)

"In recognition that original proceedings in appellate courts are truly extraordinary" (*Adams v. Department of Motor Vehicles* (1974) 11 Cal.3d 146, 150, fn. 7), rule 8.486(a)(1) requires that "(i)f the petition could have been filed first in a lower court, it must explain why the reviewing court should issue the writ as an original matter." In a section of the petition addressing why writ relief is warranted, Donor Network asserts it did not have an adequate legal remedy in the lower court because the Penal Code does not provide a procedure for third-party challenges to search warrants issued under Penal Code section 1524, and an original writ issued by this court appeared to be the only recognized legal mechanism to challenge issuance of the search warrant. Donor Network further asserts the writ will "provide direction to the [c]ounty [c]oroner as to how best to comply with California law," as it will establish the coroner's obligations to comply with the Act and "cooperate with appropriate health care organizations to facilitate organ donation while also preserving evidence vital to his or her medico-legal investigation."

These assertions are inadequate for bypassing the superior court. As to the adequacy of the legal remedy below, we question Donor Network's assertion that it did

not have standing to challenge the search warrant. A nondefendant may challenge a search warrant as inadequate, and move for return of property, if the warrant is insufficient on its face, the property is not described in the warrant, or there was not probable cause for the issuance of the warrant. (Pen. Code, §§ 1538.5, subd. (a)(1)(B), 1539, 1540; *Ensoniq Corp. v. Superior Court (Laff)* (1998) 65 Cal.App.4th 1537, 1547 (*Ensoniq Corp.*).) "[E]ven in the absence of statutory authorization, the superior court possesses the inherent power to conduct proceedings and issue orders regarding property seized" pursuant to a search warrant. (*People v. Superior Court* (2001) 25 Cal.4th 703, 713.)[8]

Moreover, as the county points out, Donor Network could have moved ex parte for a temporary restraining order in conjunction with filing a petition for writ of mandate in the superior court and received a hearing the following day. (Code Civ. Proc., §§ 527, 1085, subd. (a); rule 3.1200 et seq.; *California Assn. for Health Services at Home v. State Dept. of Health Services* (2007) 148 Cal.App.4th 696, 705 ["[a]n action in ordinary mandamus is proper where … the claim is that an agency has failed to act as required by law"].) Donor Network also could have brought an action for declaratory relief seeking a declaration of the county's mandatory duties under the Act. (Code Civ. Proc., § 1060; *City of Cotati v. Cashman* (2002) 29 Cal.4th 69, 79 [an action for declaratory relief is based on the existence of an actual, present controversy, including the construction of legislation].)

---

[8]   Donor Network asserts in its reply that it considered bringing a motion to quash the warrant, but it did not believe it had standing to do so, and in any event, it did not know the case number or the name of the judge issuing the warrant because the warrant was not served on it. Even if the warrant was not served on it, it appears Donor Network received the search warrant from the hospital. Moreover, a motion for delivery of property seized under warrant may be brought as a special proceeding. (*Ensoniq Corp., supra,* 65 Cal.App.4th at p. 1547.)

We recognize that the existence of an alternative remedy will not preclude this court's jurisdiction if the issue is one of great importance that must be resolved properly. (*Clean Air Constituency, supra,* 11 Cal.3d at p. 808.) Examples of such issues include: (1) the constitutionality of a voter-adopted initiative statute concerning gaming on Indian lands (*Hotel Employees & Restaurant Employees Internat. Union v. Davis* (1999) 21 Cal.4th 585, 590-591); (2) constitutional challenges to a voter-adopted initiative measure which our Supreme Court previously ordered placed on the primary election ballot and reserved the substantive issues pending the election's outcome (*Brosnahan v. Brown* (1982) 32 Cal.3d 236, 240-241); (3) an action to compel the state treasurer to prepare to sell bonds authorized by a new statutory program that provided for the maintenance and improvement of higher education facilities (*California Educational Facilities Authority v. Priest* (1974) 12 Cal.3d 593, 596, 598); (4) a challenge to the constitutionality of a city charter provision that required a two-year durational residence for city councilman candidates (*Thompson v. Mellon* (1973) 9 Cal.3d 96, 98); (5) determining the interpretation and constitutionality of an Education Code statute concerning pupil transportation (*San Francisco Unified School District v. Johnson* (1971) 3 Cal.3d 937, 944-945) ; and (6) the constitutionality of a state-wide law addressing how a mental patient may consent to psychosurgery and electroshock therapy where delay would dramatically affect the patients' rights (*Aden v. Younger* (1976) 57 Cal.App.3d 662, 670-671).)[9]

---

[9] In addition, our Supreme Court has exercised original jurisdiction in multiple cases affecting the right to vote or the method of conducting elections which needed to be adjudicated before an election rendered the issue moot. (See *Faulder v. Mendocino County Bd. of Supervisors* (2006) 144 Cal.App.4th 1362, 1368-1369 [seeking writ of mandate staying general election for office of county district attorney and directing cancellation of election and holding of special election]; *Ramirez v. Brown* (1973) 9 Cal.3d 199, 202-203 [county clerk refused to allow person with prior felony conviction to register to vote], revd. on other grounds *sub nom. Richardson v. Ramirez* (1974) 418

While this case involves an area of public importance, namely a coroner's duties with respect to organ and tissue donation, it is not a matter that requires the use of an extraordinary procedure to determine that question. The issue does not involve the constitutionality of a newly enacted statute, and the record does not indicate that this is a consistent problem in Merced County or more importantly, a statewide problem. Rather, this appears to be a dispute between one coroner group and one procurement organization. Moreover, there is no longer an emergency or the need for a prompt resolution. The original reason for Donor Network's petition – to stay and vacate the search warrant – no longer exists and organ donation from this potential donor is no longer an option. NAAG's chief forensic pathologist denied that NAAG applied a categorical approval or denial policy to classes of cases and asserted that NAAG and its physicians strongly support organ and tissue donation and routinely facilitate donation in appropriate cases. If the situation in this case arises again, Donor Network may seek relief from the trial court.

Finally, while this case involves an issue of statutory interpretation, namely, the meaning of section 7151.20, it also involves evidentiary issues that are best decided by the trial court. For example, there is conflicting evidence concerning communications between Donor Network and the county coroner on the coroner's decision to deny donation, which would impact any finding concerning whether the county coroner collaborated with Donor Network, and conflicting expert opinions on a coroner's duties concerning organ donation, whether denial of donation was appropriate in this case, and whether donation is ever appropriate in cases involving gunshot wounds to the head.

Appellate courts have consistently declined to exercise original jurisdiction where the application for the writ could have been made to a lower court. (*Funeral Dir. Assn. v.*

---

U.S. 24]; *Jolicoeur v. Mihaly* (1971) 5 Cal.3d 565, 569, 570, fn. 1 [addressing voter registration of newly enfranchised youth].)

*Bd. of Funeral Dirs.* (1943) 22 Cal.2d 104, 110.)  In those circumstances, the petition will be denied " 'without prejudice to the right of petitioners to seek such relief as they may be advised they are entitled to in the proper tribunal.' " (*Ibid.*)  But here we issued an order to show cause.  After considering the return and reply, we conclude the order to show cause was improvidently granted and we decline to decide the issue on the merits. (*Countrywide Home Loans, supra,* 54 Cal.App.4th at pp. 832-833.)

## **DISPOSITION**

The order to show cause is discharged as improvidently granted.  The petition for a writ of mandate is denied without prejudice to any subsequent proceedings that may be initiated in the superior court.  Each party shall bear its own costs.  This order is final upon filing.

DESANTOS, J.

WE CONCUR:


LEVY, Acting P. J.


FRANSON, J.

19.